## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### (Baltimore Division)

| | | |
|---|---|---|
| **WAYNE ALLEN, et al.** | * | |
| **Plaintiffs** | * | |
| **v.** | * | **Civil Action No.:  1:14-cv-04033** |
| **ENABLING TECHNOLOGIES CORP.** | * | |
| **Defendant** | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

### MEMORANDUM OF LAW IN SUPPORT OF
### DEFENDANT'S RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY
### JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT

Enabling Technologies Corp. ("ETC"), Defendant, by its undersigned counsel, files this Memorandum of Law in Support of ETC's Response to Plaintiffs' Motion for Summary Judgment and Cross Motion for Summary Judgment, and states as follows.

### I.        Introduction

Generally, the Fair Labor Standards Act ("FLSA") requires employers to pay their employees at least the Federal minimum wage for all hours worked and overtime pay at time and one-half the regular rate of pay for all hours worked over 40 hours.  29 U.S.C. §§ 206, 207 (LEXIS 2016).  However, certain categories of employees are "exempt" from these requirements.  Relevant to this case, §§ 13(a)(1) and 13(a)(17) of the FLSA provide an exemption for computer system analysts, computer programmers, software engineers, and other similarly skilled workers in the computer field who meet certain tests regarding their job duties and threshold compensation requirements (the "Computer Employee Exemption").  *Id.* at ¶ 213.

Shortly before this suit, ETC sued Howard Cable ("Cable") and his former supervisor at ETC, James Gilmer ("Gilmer"), in the Circuit for Baltimore County, for violating restrictive covenants contained within their respective Employment Agreements.  Also, shortly before this suit was filed, ETC terminated Wayne Allen ("Allen").  Following Allen's termination, Allen declared to Gilmer that he wished to assert any claim he allegedly had against ETC and shortly thereafter, they decided to sue ETC for an alleged violation of the FLSA.

The two primary issues in dispute in this matter are:  (a) whether Plaintiffs were properly classified as exempt employees pursuant to the FLSA's Computer Employee Exemption; and (b) assuming *arguendo* that Plaintiffs were misclassified as exempt employees, how many hours of overtime Plaintiffs worked during their respective tenures at ETC.

Plaintiffs have adopted a two-prong strategy in this case.  First, in an attempt to avoid the applicability of the Computer Employee Exemption, they have diminished their training, knowledge, and experience, as well as their understanding of their primary duties at ETC.  However, support tickets, affidavits, testimony, and ETC's records belie Plaintiffs' claim that they were merely "help desk" employees.  Cable committed to Plaintiffs' pretense by claiming that his resume includes a misrepresentation.  He claimed that the reference to software "configuration" in his resume was only "fluff," to deceive prospective employers.  Allen prepared and produced a resume specifically for the purpose of this litigation (the "Litigation Resume").  However, Allen apparently forgot that he submitted a copy of his resume to ETC in 2012.  A comparison of the Litigation Resume with the Allen's 2012 resume reveals that he intentionally deleted qualifications that would have revealed his sophistication in the information technology field.  *See* discussion *infra*.

Second, in an attempt to obtain extraordinary judgments against ETC, Plaintiffs have grossly inflated the number of overtime hours they worked during their tenure at ETC.  No dispute exists that Plaintiffs worked overtime.  Each Plaintiff was on-call every four to six weeks and they were required to provide necessary support while on-call.  Ticket histories, employee affidavits, and other circumstantial evidence refute Plaintiffs' estimate of overtime.

Furthermore, no dispute exists that ETC did not maintain time records since Plaintiffs were classified as exempt employees.  However, contrary to Plaintiffs' contention, the absence of timekeeping records does not mean that the Court must accept Plaintiffs' claim that they worked an average of 50 hours during regular weeks and 92 hours during on-call weeks.  Plaintiffs have fabricated inconsistent estimates of hours worked throughout this matter and seem to believe, in the absence of timekeeping records, that they are entitled to recover unpaid wages based on contrived hours they presented to this Court.  However, the FLSA is not intended to be a means by which unscrupulous plaintiffs can pursue vendettas against former employers.  Here, Plaintiffs' credibility is genuinely at issue and the circumstantial evidence belies their self-serving testimony.

## II.   Factual Background

### A.  ETC's History

In 1992, Bill Vollerthum, the President of ETC, incorporated ETC under Maryland law.  **Exhibit 1**, Affidavit of William Vollerthum at ¶ 2.  ETC provides unified communications ("UC") and unified messaging ("UM") solutions, including information technology ("IT") infrastructure, objective strategic assessment, design, planning, and implementation to a variety of clients throughout the United States.  *Id.* at ¶ 3.  UC and UM refer to the integration of communication services, including instant messaging, e-mail, telephone, and web and video conferencing.  **Exhibit 2**, Affidavit of Christopher L. Dean at ¶ 7.

UC/UM is a highly specialized, burgeoning field within the IT industry.  *Id.* at ¶ 8.  Before the instant dispute, ETC had never been involved in a FLSA dispute and no employee, including Plaintiffs, has ever suggested that he or she was misclassified as an exempt employee.  Exhibit 1 at ¶ 4.

### B.  ETC's Support Services

Generally, ETC provides four types of service packages to its support customers.  **Exhibit 3**, Affidavit of William Fannin at ¶ 9.  First, under the Basic Care Contract ("Basic Care"), ETC supports Microsoft Lync 2013 and Exchange Unified Messaging.  *Id.* at ¶ 10.  Basic Care coverage does not include installation of software patches and service packs.  *Id.* at ¶ 11.  ETC provides coverage 5 days a week, Monday through Friday from 8:30 a.m. to 5:00 p.m., excluding holidays and weekends.  *Id.* at ¶ 12.  ETC also permits its Basic Care customers to purchase additional coverage, which could include support during On-Call Periods.  *Id.* at ¶ 13.

Second, ETC provides Audiocode 24 x 7 contract.  *Id.* at ¶ 14.  Such customers receive limited support for only their gateway, but such service is provided on a 24 x 7 basis.  *Id.*

Third, under the Proactive Care contract, ETC provides support for Microsoft Lync 2013 and Exchange Unified Messaging.  *Id.* at ¶ 15.  ETC alerts customers of new software releases, service packs and patches when they become available.  *Id.*  However, installation of software patches and service packs is excluded in the Proactive Care service agreement.  *Id.*  ETC provides Proactive Care coverage on a 24 x 7 basis, including holidays and weekends.  *Id.*

Fourth, under the Total Care contract, ETC provides support for Microsoft Lync 2013 and Exchange Unified Messaging.  *Id.* at ¶ 16.  ETC also provides server operating system updates, service packs, application updates, hot fixes, and cumulative updates.  *Id.*  Total Care Coverage is provided on a 24 x 7 basis, including holidays and weekends.  *Id.*  Furthermore, under the Basic Care or Audiocodes

packages, customers may pay for after-hours support on an hourly basis.  *Id.*

Since 2012, ETC's support customers have increased from 54 to 61.  *Id.* at ¶ 18.  In 2012,

ETC had a total of 54 support customers.  *Id.* at ¶ 19.  In 2013, ETC had a total of 52 support customers.

*Id.*   In 2014, ETC had a total of 59 support customers.  *Id.*   In 2015, ETC had a total of 61 support

customers.  *Id.*

Additionally, the scope of services provided to ETC's customers has remained constant since 2012.

*Id.* at ¶ 20.  The number of customers receiving support after hours under the aforementioned contracts or

by paying an hourly rate for after-hours services has remained constant or increased since 2012.  *Id.* at ¶

21.  Accordingly, ETC's volume of business has increased or, at the very least, remained constant since

January 2012.  *Id.* at ¶ 22.

The vast majority of ETC's clients have internal help desk employees or computer support

specialists who attempt to resolve the customer's IT issues internally.  *Id.* at ¶ 24.  ETC's customers' help

desk personnel attempt to resolve UM/UC issues, as well as other IT support issues.  *Id.* at ¶ 25.  Many of

the issues handled by each customer's help desk personnel constitute low-level, or "Tier 1" issues.  *Id.* at

¶ 26.  If ETC's customers' help desk employees are unable to resolve a UM/UC issues, then the support

specialist will escalate the issue to ETC's UC/UM Support Engineers.  *Id.* at ¶ 27.

### C.  The Technical Background and Primary Duties of Support Engineers

ETC employs UC/UM Support Engineers ("Support Engineers") to provide customer support and

to update clients' systems.[1]  Exhibit 1 at ¶ 5.  Support Engineers have a technical background in the IT,

software, and/or computer science fields.  *Id.* at ¶ 6.

---

[1] ETC has used the titles "Messaging Engineer," "Unified Messaging Engineer," "Unified Communications Engineer," and "UM/UC Support Engineer" synonymously.

Support Engineers' training, knowledge, and experience provides them with a skill level beyond the skill set ordinarily possessed by a "help desk" employee or computer support specialist.  Exhibit 3 at ¶ 28.  Support Engineers have a skill level similar to a computer systems analyst.  Exhibit 2 at ¶ 11.  Both Support Engineers and computer systems analysts consult with managers of customers to determine the role of the IT system within the organization.  *Id.*  Support Engineers and computer systems analysts devise ways to add new functionally to existing computer systems, conduct testing to ensure the systems work as expected, and train the system's end users and write instructions to assist their customers.  *Id.*  Both Support Engineers and computer systems analysts are responsible for an immense volume of data.  *Id.* Both Support Engineers and computer systems analysts generally receive greater compensation than that received by a computer support specialist or mere "help desk" employee.  *Id.*

As further discussed herein, the primary duties of Support Engineers include the application of systems analysis techniques, including consultation with users, to determine hardware, software, and/or system functional specifications.  Exhibit 2 at ¶ 12; Exhibit 3 at ¶ 29.  Support Engineers also analyze, test, and/or modify computer systems or programs based on and related to user or system design specifications or machine operating systems.  Exhibit 2 at ¶ 13; Exhibit 3 at ¶ 30.  Support Engineers are also responsible for the implementation and customization of highly complex UM and UC integrations, solving technical problems, working with vendors to track and manage issue resolution, and interacting with ETC's field engineers, employees, and users.  Exhibit 2 at ¶ 14; Exhibit 3 at ¶ 31.

ETC has operated with approximately the same number of Support Engineers throughout 2015 as it had from 2012 through 2014.  Exhibit 3 at ¶ 32.  During Plaintiffs' tenure with ETC, ETC employed 3-5 Support Engineers.  *Id.*  Similarly, throughout 2015, ETC employed 4-5 Support Engineers.  *Id.*

### D.  The Mechanics of ETC's Support

ETC uses an IT Management Software System, known as Kaseya, to manage and resolve IT issues. *Id.* at ¶ 33.  Support Engineers are notified of support issues primarily in two ways.  First, customers' servers send alerts to Kaseya.  *Id.*  Many of the alerts are duplicative and do not require a response, but must be reviewed nonetheless to confirm that no response is required.  Second, customers send support requests to Support Engineers.  *Id.*  The support requests may be duplicative of alerts concerning a server malfunction or may be an issue affecting an individual user.  *Id.*  Both the alerts and support requests are populated in a general queue in Kaseya and are referred to as "tickets."  *Id.*

Each Support Engineer also has an individual queue in Kaseya.  *Id.* at ¶ 34.  During regular business hours, from 8:30 a.m. to 5:00 p.m., the tickets are claimed in sequential order by the Support Engineers based upon each Engineer's availability and bandwidth.  *Id.*  Periodically, the Support Manager will assign tickets to the Support Engineers.  *Id.*  When a ticket is assigned to a Support Engineer, it is transferred from Kaseya's general queue to the specific Support Engineer's individual queue.  *Id.*  The Support Engineers address a single ticket at a time.  *Id.*  They are obligated to update a ticket, if necessary, close tickets immediately after resolving an issue, or determine that no action is required.  *Id.*  Closing a ticket takes less than a second and merely consists of clicking a box in Kaseya.  *Id.*

One of ETC's former clients, First Quality Enterprises, Inc. ("FQE"), had its own proprietary ticketing system known as "Big Web."  *Id.* at ¶ 35.  The Support Engineers who addressed FQE's issues addressed FQE tickets within Big Web, rather than Kaseya.  *Id.*

Contrary to Plaintiffs' contention, ETC does not provide the Support Engineers resources, guides, or scripts that they are obligated to follow.  *Id.* at ¶ 36.  Rather, the Support Engineers have the discretion and autonomy to use any credible resources beneficial to resolving an issue.  *Id.*  Such resources may

include, but do not necessarily include, Google or TechNet. *Id.* Furthermore, contrary to Plaintiffs' claim, FQE did not provide ETC a guide concerning the resolution of UC/UM issues. *Id.* Rather, FQE provided a guide that outlined policies for managing tickets and accessing FQE's environment. *Id.*; **Exhibit 4**, FQE Notes. ETC also does not provide its Support Engineers with checklists concerning ticket resolution. Exhibit 1 at ¶ 12; Exhibit 3 at ¶ 36. Once again, the Support Engineers have the discretion and autonomy to create their own checklist or any other personalized process that they believe might be beneficial. *Id.* Nor does ETC provide the Support Engineers with checklists to test updates. Exhibit 3 at ¶ 36.

If a Support Engineer is unable to resolve a ticket, he is obligated to seek assistance from another Support Engineer, field engineer, or vendor. *Id.* at ¶ 37. With the exception of UC hardware, such tickets are not "escalated" to another support team. *Id.* Rather, the assigned Support Engineer works collaboratively with others to attempt to resolve the ticket. *Id.* In other words, once a Support Engineer is assigned a ticket, he was obligated to resolve the issue. *Id.*

### E.  The Work Schedules of ETC's Support Engineers

Support Engineers' work schedules are split between regular work weeks ("Regular Work Weeks") and on-call weeks ("On-Call Weeks"). Exhibit 1 at ¶ 7. During On-Call Weeks, one Support Engineer is on-call from approximately 5:00 p.m. to 8:30 a.m., Monday through Thursday, and is on-call from approximately 5:00 p.m. on Friday through 8:30 a.m. on Monday. *Id.* During On-Call Weeks, the On-Call Support Engineer is obligated to have ready access to his or her cell phone and to check e-mails frequently. *Id.* at ¶ 8. The On-Call Support Engineer is also obligated to respond to support requests and to review alerts. *Id.* If an alert is actionable, then the Support Engineer is obligated to respond to such alert. *Id.* The On-Call Support Engineer is also obligated to periodically perform scheduled maintenance. *Id.*

The On-Call Support Engineer is free to participate in personal activities during On-Call Weeks. Exhibit 3 at ¶ 38.  For example, during On-Call Weeks, the On-Call Engineer is not obligated:  a) to remain in ETC's office or in his or her home; b) return to ETC's office or his or her home to respond to a customer issue; c) wear uniforms; d) abstain from sleeping; e) abstain from driving a vehicle; f) or abstain from personal, familial, or recreational activities.  *Id.*  ETC pays the On-Call Support Engineer additional compensation of $350 - $400 for additional time worked during the On-Call Weeks.  *Id.*

During Regular Work Weeks, Support Engineers work Monday through Friday, 8:30 a.m. to 5:00 p.m., with a lunch break for one hour.  *Id.* at ¶ 39.  Support Engineers generally work 40 hours or less during Regular Work Weeks.  *Id.*  They may occasionally work an hour or two of overtime each week if attempting to close a ticket.  *Id.*  However, Support Engineers, who are not on-call, generally do not work beyond 5:00 p.m., since ETC's On-Call Support Engineer would begin handling incoming tickets between 4:30 p.m. and 5:00 p.m. each weekday.  *Id.*

Due to their skill level and primary duties, ETC's Support Engineers are classified as exempt employees.  Exhibit 1 at ¶ 10.  Since Plaintiffs were classified as exempt, ETC did not track their hours. *Id.* Furthermore, many of the Support Engineers work remotely.  *Id.*  Nevertheless, ETC's employees, Kaseya records, and Big Web records indicate that, at all pertinent times, Support Engineers customarily worked approximately 40 hours per week during Regular Work Weeks and approximately 50 – 60 hours during On-Call Weeks.  *Id.*

In or around January 2015, Support Engineers began tracking their hours to obtain additional information concerning the time that they were devoting to each client.  *Id.* at ¶ 11.  Such records also indicate that Support Engineers worked approximately 40 hours per week during Regular Work Weeks and worked less than 60 hours during On-Call Weeks.  *Id.*

### F.  James Gilmer's Employment at ETC

On July 20, 2009, ETC hired James Gilmer ("Gilmer") as a Support Manager.  **Exhibit 5**, Affidavit of Pamela Novak-Patrick at ¶ 3.  Gilmer supervised both Cable and Allen during part of their respective tenures at ETC.  Exhibit 1 at ¶ 13.  Before their employment by ETC, both Gilmer and Cable worked at Prometric, Inc. ("Prometric").  **Exhibit 6**, Transcript of Deposition of Howard Cable at 41:6-20.  Gilmer and Cable are good friends.  **Exhibit 7**, Transcript of Deposition of James Gilmer, *Enabling Technologies Corp v. James W. Gilmer, et al*., Vol. I at 192:2-7.  Indeed, Cable was in Gilmer's wedding in 2003.  *Id.* at 156:17-18.  After Cable was terminated from Prometric, he contacted Gilmer concerning possible employment at ETC.  Exhibit 6 at 38:10-20.  Gilmer and principals of ETC interviewed Cable, and on or about November 24, 2009, Gilmer submitted an offer letter to Cable.  **Exhibit 8**, Letter from James W. Gilmer, November 24, 2009.

Gilmer was also involved in hiring Wayne Allen.  On August 2, 2012, Gilmer submitted an e-mail to Vollerthum, in which he identified Allen as a good candidate for a "mid-level support position." **Exhibit 9**, E-mail from James Gilmer, August 2, 2012.   Gilmer stated that Allen's "area of expertise" is Exchange and Office 365.  *Id.*   Gilmer also noted that Allen was a "Tier II Microsoft Subject Matter Expert."  *Id.*  On or about August 3, 2012, Gilmer submitted an offer letter to Allen.  **Exhibit 10**, Letter from James Gilmer, August 3, 2012.

### G.  Howard Cable's Employment at ETC

Cable worked for ETC as a Support Engineer from December 14, 2009 to August 2014.  Exhibit 5 at ¶ 4.  Cable's starting base salary was $63,000.  *Id.* at ¶ 5.  Cable's salary increased to $66,780 on or about April 15, 2011, increased to $70,787 on or about April 15, 2012, and increased to $74,326.35 on or about October 15, 2013.  *Id.*  Cable also received compensation of $350 - $400 in addition to his salary

for each week in which he was on-call. *Id.* at ¶ 6. Additionally, ETC provided him health, dental, and vision insurance, a $50,000 life insurance policy, paid short-term and long-term disability coverage, 401K benefits, paid vacation based upon years of service, two personal days, an additional vacation day on his birthday, and up to five sick days per year. *Id.* at ¶ 7. Furthermore, ETC reimbursed Cable's business expenses, including $90 per month for cell phone service and high speed internet service in his home. *Id.* at ¶ 8. ETC also provided Cable with a laptop. *Id.* Cable was scheduled to work two days each week in ETC's office, located at 12226 Long Green Pike, Glen Arm, Maryland 21057. *Id.* Cable worked the rest of the week remotely from his home office. *Id.* Cable often left ETC's office early and would occasionally boast about going home to relax at his pool. Exhibit 3 at ¶ 40.

According to Cable's resume, during his tenure at ETC, he performed configuration, troubleshooting, and administration of OCSr2, Lync 2010, Lync 2013, Audio Code, and Sonus Gateways. **Exhibit 11**, Resume of Howard Cable. He also was responsible for setting up Office 365 and performing administration and maintenance. *Id.* Additionally, Cable was responsible for server certification renewals and Active Directory administration. *Id.* Cable's resume also notes that during his tenure at ETC, he coached new team members to improve their skills and performance. *Id.*

As a Support Engineer, Cable had a skill level and performed work similar to a computer systems analyst. Exhibit 2 at ¶ 15; Exhibit 3 at ¶ 41. Cable consulted with managers of customers to determine the role of the IT system of the organization, devised ways to add new functionality to existing computer systems, conducted testing to ensure the systems worked as expected, and trained the system's end users and wrote instructions to assist their customers. *Id.* Cable was also responsible for an immense volume of data. *Id.*

As a Support Engineer, Cable's primary duties consisted of applying systems analysis techniques, including consultation with users to determine hardware, software, and/or system functional specifications. Exhibit 2 at ¶ 16; Exhibit 3 at ¶ 42. He also analyzed, tested, and/or modified computer systems or programs based on and related to user or system design specifications or machine operating systems. *Id.* Cable was also responsible for the support of highly complex UM and UC integrations, solving technical problems, working with vendors to track and manage issue resolution, and interacting with ETC's field engineers, employees, and users. *Id.*

While ETC did not track Cable's hours with a timekeeping system, since he was classified as an exempt employee, ETC's records indicate that Cable rarely worked overtime during Regular Work Weeks. For example, throughout 2014, Cable closed a total of 5 tickets after 5:00 p.m. Exhibit 3 at ¶ 44. Furthermore, based upon ETC's records and statements from its current and former employees, Cable worked, at most, an average of 50 – 60 hours per week during On-Call Weeks. *Id.* Indeed, ETC's records indicate that Cable worked fewer than 50 hours during On-Call Weeks, and often did not perform work after 5:00 p.m. during On-Call Weeks, unless he was performing scheduled maintenance. *Id.* The records further indicate that Cable often would not address tickets afterhours during the On-Call periods. *Id.* Rather, he often would address tickets the following morning. *Id.* The records also indicate that Gilmer would periodically close tickets for Cable. *Id.*

### H.  Wayne Allen's Employment at ETC

Allen was employed by ETC as a Support Engineer from September 4, 2012 to November 28, 2014. Exhibit 5 at ¶ 10. Allen's starting base salary was $52,500, which increased to $55,125 on or about October 15, 2013. *Id.* at ¶ 11. In addition to his salary, Allen received premium compensation of $350 - $400 each week in which he was on-call. *Id.* at ¶ 12. Additionally, ETC provided health, dental, and

vision insurance, a $50,000 life insurance policy, paid short-term and long-term disability coverage, 401K benefits, paid vacation based upon years of service, two personal days, an additional vacation day on Allen's birthday, and up to five sick days per year. *Id.* at ¶ 13. Furthermore, ETC reimbursed his business expenses, including $90 per month for cell phone service and $45 per month for high speed internet service in Allen's home. *Id.* at ¶ 14. ETC also provided Allen with a laptop. *Id.*

Allen is a subject matter expert in Office 365. **Exhibit 12**, Resume of Wayne Allen. Accordingly, he often handled support tickets involving Office 365. Exhibit 3 at ¶ 45. As a Support Engineer, Allen had a skill level similar to a computer systems analyst. Exhibit 2 at ¶ 18; Exhibit 3 at ¶ 46. Allen consulted with managers of customers to determine the role of the IT system of the organization, devised ways to add new functionality to existing computer systems, conducted testing to ensure systems worked as expected, and trained the system's end users and wrote instructions to assist ETC's customers. *Id.* Allen was also responsible for an immense volume of data. *Id.* As a Support Engineer, Allen's primary duties consisted of applying systems analysis techniques, including consultation with users to determine hardware, software, and/or system functional specifications. Exhibit 2 at ¶ 19; Exhibit 3 at ¶ 47. He also analyzed, tested, and/or modified computer systems or programs based on and related to user or system design specifications or machine operating systems. *Id.* Allen was responsible for supporting highly complex UM and UC integrations, solving technical problems, working with vendors to track and manage issue resolution, and interacting with ETC's field engineers, employees, and users. Exhibit 2 at ¶ 20; Exhibit 3 at ¶ 48.

While ETC did not track Allen's hours with a timekeeping system, since he was classified as an exempt employee, he certainly did not work the number of overtime hours that he claims. Exhibit 3 at ¶ 49. For example, between October 8, 2014 and December 1, 2014, Allen worked an aggregate of

approximately 2 hours of overtime during Regular Weeks.  *Id.*  Furthermore, based upon ETC's records and statements from its current and former employees, Allen worked at most, an average of $50 - 60$ hours per week during On-Call Weeks.  *Id.*

**I.   ETC's Action Against James Gilmer and Howard Cable for Their Breach of Their Respective Employment Agreements**

When Gilmer and Cable began working for ETC, each of them executed an Employment Agreement, which included restrictive covenants (the "Restrictive Covenants").  Exhibit 1 at ¶ 14; **Exhibit 13**, Employment Agreement, James Gilmer; **Exhibit 14**, Employment Agreement, Howard Cable.  Among other prohibitions, the Restrictive Covenants prevented Gilmer and Cable from providing services to a competing organization for a one year period following termination of employment and from soliciting ETC's customers for a period of 18 months following termination of employment.  Exhibit 14 at § 3(a)-(c); Exhibit 15 at § 3(a)-(c).

On June 30, 2014, ETC terminated Gilmer's employment.  Exhibit 1 at ¶ 15.  On August 13, 2014, Gilmer organized Tech Connections, LLC ("TCL") to "provide technology consulting and services."  **Exhibit 15**, Certificate of Limited Liability Partnership.  Also on August 13, 2014, Cable's employment at ETC ended, and he began to provide services to Gilmer and/or TCL.  Exhibit 1 at ¶ 16.  Shortly thereafter, Coastal Environmental Group, Inc. ("Coastal"), a well-established and long-term client of ETC, provided notice, effective October 8, 2014, that it intended to terminate its relationship with ETC.  *Id.* at ¶ 17.  ETC was subsequently informed that Coastal intended to engage TCL for its IT needs.  *Id.* at ¶ 18.  On or about October 8, 2014, Coastal engaged TCL to provide UC/UM services.  *Id.* at ¶ 19; **Exhibit 16**, E-mail from Christopher Ward, October 8, 2014.

On October 14, 2014, after unsuccessfully attempting to resolve the dispute concerning  Gilmer's and Cable's breach of their respective Employment Agreements, ETC initiated a suit in the Circuit Court

for Baltimore County, *Enabling Technologies Corp. v. James W. Gilmer, et al.*, Case No. 03-C-14-011112 (the "Circuit Court Litigation"), in which ETC sought injunctive relief and damages.

### J.   The Instant Suit

On November 28, 2014, ETC fired Allen.  Exhibit 1 at ¶ 20.  Following his termination, Allen contacted Gilmer concerning his desire to assert "whatever legal claim" he purportedly had against ETC. **Exhibit 18**, Transcript of Deposition Wayne Allen at 42:1-4.  Their discussion included the Circuit Court Litigation.  *Id.* at 42:14-19.  Shortly thereafter, Allen contacted Cable and they discussed asserting a claim against ETC.  Exhibit 7 at 51:4-12.  Cable subsequently informed Allen that he also would like to assert a claim against ETC.  *Id.* at 50:19-21.

On December 30, 2014, Plaintiffs initiated this action against their former employer, Defendant, Enabling Technologies Corp. ("ETC"), claiming that ETC violated the Fair Labor Standards Act ("FLSA"), the Maryland Wage and Hour Law ("MWHL"), and the Maryland Wage Payment and Collection Law ("MWPCL").  **Doc. No. 1**, Complaint.  On December 30, 2014, Plaintiffs initiated the instant action.  **Doc. No. 1/0**, Complaint.  On February 29, 2016, Plaintiffs field a Motion for Summary Judgment.  **Doc. No. 27/0**, Motion for Summary Judgment.

### III.   Analysis

Federal Rule 56(a) provides, in pertinent part:

> A party may move for summary judgment, identifying each claim or defense – or the part of each claim or defense – on which summary judgment is sought.  The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment.

FED. R. CIV. PRO. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); *Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Celotex Corp.*, 477 U.S. at 322; *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986); *JKC Holding Co. LLC v. Washington Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001).

Here, Plaintiffs argue that they are entitled to summary judgment.  As discussed herein, Plaintiffs' Motion for Summary Judgment should be denied and judgment entered in favor of ETC because:

1. Plaintiffs have failed to establish that they were improperly classified as exempt employees under the Computer Employee Exemption;

2. The evidence clearly establishes that Plaintiffs qualified for the Computer Employee Exemption and were properly classified as exempt employees and ETC is entitled to judgment as a matter of law;

3. Assuming *arguendo* that Plaintiffs were misclassified as exempt employees, they have grossly inflated the number of hours of overtime they worked, and at most, worked an average of 50-60 hours during On-Call Weeks; and

4. Assuming *arguendo* that Plaintiffs were misclassified as exempt employees, Plaintiffs are not entitled to liquidated or treble damages, and the applicable statute of limitations under the FLSA is two years.

## A.  Plaintiffs Have Failed to Establish That They Were Improperly Classified as Exempt Employees Under the Computer Employee Exemption

Preliminarily, Plaintiffs claim that ETC has waived the Computer Employee Exemption.  As argued in ETC's Motion for Leave to File Amended Answer, assuming *arguendo* that ETC failed to sufficiently plead the Computer Employee Exemption Defense, Plaintiffs incurred no prejudice because ETC expressly advised Plaintiffs of that defense time and time again throughout the discovery period in this matter.  Indeed, the Computer Employee Exemption was one of the primary issues addressed in numerous depositions taken by Plaintiffs and ETC.  In fact, Plaintiffs have devoted much of their Motion for Summary Judgment to the applicability of such exemption.  Clearly, Plaintiffs have not been

prejudiced by ETC's alleged insufficient pleading.  ETC incorporates herein its Motion for Leave to File Amended Answer, Memorandum in Support thereof, and Exhibits attached thereto.  **Doc. No. 31/0**, Motion for Leave to File Amended Answer.

Generally, the Fair Labor Standards Act ("FLSA") requires employers to pay their employees at least the Federal minimum wage for all hours worked and overtime pay at time and one-half the regular rate of pay for all hours worked over 40 hours.  29 U.S.C. §§ 206, 207 (LEXIS 2016).  However, pursuant to the Computer Employee Exemption, computer system analysts, computer programmers, software engineers, and other similarly skilled workers in the computer field who meet certain tests regarding their job duties and who meet the threshold compensation requirements are exempt from the FLSA's overtime compensation requirements.  *Id.* at ¶ 213.  To qualify for the Computer Employee Exemption, the following test must be met:

1. The employee must be compensated at least $455 per week on a salary basis or paid on an hourly basis, at a rate of not less than $27.63 an hour.

2. The employee must be employed as a computer systems analyst, computer programmer, software engineer or other similarly skilled worker in the computer field performing the duties described below:

   a. The application of systems analysis techniques and procedures, including consulting with users, to determine hardware, software or system functional specifications;

   b. The design, development, documentation, analysis, creation, testing or modification of computer systems or programs, including prototypes, based on and related to user system design specifications;

   c. The design, documentation, testing, creation or modification of computer programs related to machine operating systems; or

   d. A combination of the aforementioned duties, the performance of which requires the same level skills.

*Id.*

17

The phrase "primary duty" refers to the employee's "principal, main, major, or most important duty." 29 C.F.R. § 541.700.  In determining an employee's primary duty, the courts consider "all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole."  *Id.*  The amount of time an employee devotes to exempt work may be a "useful guide" in determining whether the employee's primary duty consists of exempt work.  *Id.*  "[E]mployees who spend more than 50 percent of their time performing exempt work will generally satisfy the primary duty requirement."  *Id.*

Importantly, an employee's job duties, not his job title, are determinative of whether the Computer Employee Exemption applies.  29 C.F.R. § 541.400(a) ("Because job titles vary widely and change quickly in the computer industry, job titles are not determinative of the applicability of the exemption").  This distinction is critical because, Plaintiffs have erroneously recast themselves as "help desk" employees and rely on authority relating to help desk employees, rather than the authority discussing the kind of high-level, sophisticated work actually performed by Plaintiffs.

In *Sethi v. Narod*, 974 F. Supp. 2d 162 (E.D.N.Y. 2013), the U.S. District Court for the Eastern District of New York identified several factors considered by the courts to evaluate the applicability of the Computer Employee Exemption, including:

> (1) the volume of data the employee managed; (2) the number of users the employee supported; (3) the type and complexity of the problems that were handled by the employee . . .; (4) the layers of assistance below the employee to handle lower-level or simple problems, including whether there was a helpdesk below the employee to handle routine issues; (5) the skill level of the employee, including certifications held, and the relevance and importance of those skills and certifications in the execution of the job; (6) the level of initiative, creativity, strategy, etc., allowed the employee in the execution of their job responsibilities; (7) the priority of the employee's work relative to the overall work of the company; and (8) the relation of their role and compensation as compared to other technical employees.

*Id.* at 179.  In this case, an analysis of each of the aforementioned factors clearly establishes that Plaintiffs qualified for the Computer Employee Exemption.

18

### 1. Plaintiffs' Primary Duties Consisted of the Resolution of Complex Problems

In assessing the applicability of the Computer Employee Exemption, perhaps one of the most important factors considered by the court is the type and complexity of the problems handled by the employee, including whether complicated problems were escalated to the employee.[2]  Under the multi-tiered system, Tier 1 is the initial level of support.  Exhibit 2 at ¶ 8.   It constitutes basic level support, during which the support representative obtained information from the customer by analyzing the problem and attempting to determine the underlying issue.  *Id.*  Tier 2 support is an intermediate level, which requires technicians with more training knowledge and experience.  *Id.*  Such support involves advanced technical troubleshooting and analysis.  *Id.*  Tier 3 is the highest level of support in the three-tiered support system.  *Id.*  Tier 3 technicians are responsible for handling the most advanced support issues.  *Id.*  Tier 3 technicians are considered experts in their field.  *Id.*

ETC's Support Engineers are responsible for the support of highly complex UM and UC integrations, solving technical problems, working with vendors to track and manage issue resolution, and interacting with ETC's field engineers, employees, and users.  Exhibit 3 at ¶ 31.  The skills used by Plaintiffs are substantially similar to the skills used by computer systems analysts.  Exhibit 2 at ¶ 11.  Both Support Engineers and computer systems analysts consult with managers of customers to determine the role of the IT system of the organization.  *Id.*  Both computer employees devise ways to add new functionality to existing computer systems, conduct testing to ensure the systems work as expected, and train the system's end users and write instructions to assist customers.  *Id.*  Both Support Engineers and computer systems analysts are responsible for an immense volume of data.  *Id.*

---

[2] ETC shall address the factors considered by the courts in order of importance in the instant case, rather than the order presented by the Court in *Sethi v. Narod*, 974 F. Supp. 2d 162 (E.D.N.Y. 2013).

The support services provided by Plaintiffs primarily consisted of Tier 2 support.  That is, such services involved advance technical troubleshooting and analysis.  *See* Exhibit 3 at ¶ 23.  Plaintiffs attached select FQE support tickets as Exhibit 8 to its Motion for Summary Judgment to support their claim that Plaintiffs merely provided Tier 1 support.  However, Plaintiffs excluded the vast majority of the tickets from the FQE support tickets ("FQE Support Tickets").  *See* **Exhibit 18,** FQE Support Tickets. The FQE Support Tickets reflect the FQE tickets handled by Cable throughout 2014.  Exhibit 3 at ¶ 52. According to Christopher L. Dean, ETC's designated expert in this matter, an analysis of the FQE Support Tickets reveals that the vast majority of Cable's support tickets constituted Tier 2 issues.  Specifically, approximately 22% of such tickets constituted Tier 1 work, while approximately 77% of the tickets constituted Tier 2 work.  Exhibit 2 at ¶ 24.  The remaining tickets were beyond Tier 2 work.  *Id.*  Cable's tickets also indicate that he occasionally provided Tier 3 services.  **Exhibit 19**, Howard Cable Support Tickets at ETC001076, ETC001079, ETC001091.

Cable's performance review also reveals Cable's experience and skill level.   Cable's 2013 performance review provides, in pertinent part:

> Howard has managed the new servers involving AD MAC's and overall support.  He has worked with FQE security team to develop and maintain Process & Procedure documentation for the entire team.  He's trained all team members and reviews their work to ensure even the smallest detail isn't missing.  His work and management of the team has been outstanding and a big reason FQE is happy with our services. . .
> . . .
> Howard has played a key role in the training and development of the new engineers over the past 2+ years.  Starting with Aaron[,] he has displayed great leadership and mentoring abilities which has continued with Wayne and Alex.
>
> I began giving Howard more leadership projects and objectives in the past year.  He has stepped up and taken them on with great results.  When I am unavailable or out of the office, I rely on Howard as a senior member of the team to take over some leadership responsibilities. . .

**Exhibit 20**, Performance Review of Howard Cable, 2013.

Allen also primarily provided Tier 2 services to ETC's customers.  Exhibit 2 at ¶ 23.  Indeed, on September 2, 2014, Allen e-mailed his supervisor, William Fannin, and implicitly acknowledged that he was performing Tier 2 services, but needed additional training to perform "at the highest level as a Tier 3 UC engineer."  **Exhibit 21**, E-mail from Wayne Allen, September 2, 2014.   Allen's performance review also reveals his level of experience, which states, in pertinent part:  "Wayne has been a good mentor to Alex and helped with his progression and knowledge level for Tier 1 & 2 requests.  Even without direction from me, Wayne provides continued guidance to Alex."  **Exhibit 22**, Performance Review of Wayne Allen at ETC001325.  Indeed, Allen acknowledged during his deposition that he was obligated to provide Tier 2 services:

> Q. Is it fair to say the support engineers at Enabling Technologies were expected to have the ability to provide Tier 2 services?
> A. I could only speak to what I was expected to provide.
> Q. Based on what you just testified to is it fair to say that Will Fannin expected you to have the ability to address Tier 2 issues?
> A. Fannin did.  Yes, he did.

Exhibit 17 at 57:9-17.

Nevertheless, Plaintiffs have adopted the position that they merely provided "low-level customer and tech support commonly referred to as 'help desk' services."  Doc. No. 27-3 at 2. Throughout this matter, Plaintiffs have attempted to diminish their skills and the services they provided at ETC.  Plaintiffs' position simply is incredible in light of the foregoing evidence.  An analysis of Plaintiffs' deposition testimony reveals that they have made a concerted effort to misconstrue their level of experience.

During Cable's deposition, he feigned ignorance concerning the services he provided during his five year tenure at ETC:

> Q. And directing your attention to the first page of your resume to the section entitled Technical Experience.  Your resume indicates that you have experience in unified communications, correct?

A. That's correct.
Q. What is Unified Communications?
A. That's a good question. *I'm not really sure I know how to define it*, other than it just being phones, instant messaging emails sort of combined is the best way to describe it.
. . .
Q. Is there a difference between a unified messaging engineer and a unified communications engineer?
A. I don't even know what the definition of those are.
Q. Okay.  You're not, you're not familiar with the term unified communications engineer?
A. I've heard what it is – I've heard the term, but I don't know what defines it.
. . .
Q. Okay.  So your testimony is you're not sure what a unified messaging engineer is?
A. That's correct
Q. And you're also not sure what a unified communications engineer is?
A. That's correct.

Exhibit 6 at 18:1-19:19.  Cable's purported inability to answer simple questions concerning the UC/UM field is odd since Cable worked in such field for approximately five years.  Cable's testimony suggests that he is intentionally denigrating his expertise in the UC/UM field specifically for the purpose of convincing the Court that he was merely a "help desk" employee.

A more telling sign of Plaintiffs' subterfuge occurred when he was questioned about configuration of computer software.   According to Cable's resume, during his tenure at ETC, he "[p]erformed *configuration*, troubleshooting and administration of OCSr2, Lync 2010, Lync 2013."  Exhibit 11 at 1 (emphasis added).  Cable testified as follows:

Q. Let me direct your attention back to Exhibit 2, which is your resume.
A. Um-hum.
Q. I'm directing your attention to the bottom of of, of the first page and the first bullet point under, under the section dealing with Enabling Technologies.  The first bullet point states, performed configuration, troubleshooting and administration of OCSr2, Lync 2010, Lync 2013, correct?
A. Um-hum.
Q. And we had, we talked earlier about what those programs are?
A. Right.
Q. Explain to me what configuration of those programs would consist of.
A. Putting in value – well, there's no – *I didn't do any of the configuration*.  I did the administration of it, so I, *I wouldn't know* – like I said, *field engineers did all of the configuration, so that wasn't me.*

Q. Okay . . . your resume says performed configuration –
A. Right.   That was basically just trying – it's a resume, *so you sort of fluff it up to get a job maybe, add, add a little more, but the bottom line is I didn't do any configuration.*
Q. So configuration is inaccurate?
A. Yeah, I would say.

Exhibit 6 at 71:18-73:4 (emphasis added).  Cable's deposition testimony is striking because he began explaining configuration of the aforementioned software and momentarily forgot his contrived role of a bumbling neophyte.  Notably, he stopped mid-sentence and claimed that he did not perform configuration, realizing that his ruse would be exposed by his answering the question.  When confronted with the conflict between the persona he has adopted in this case and qualifications outlined in his resume, Cable resorted to misrepresentation.  Ironically, Cable claimed that a truthful statement appearing in his resume was a falsification.

Plaintiffs have also attempted to distinguish their skill level from the other Support Engineers on the support team, and in doing so indisputably lie.  Cable testified as follows:

Q. The first paragraph [of Cable's employment offer letter] indicates that you were hired as a messaging engineer at Enabling Technologies, correct?
A. Um-hum.
Q. And did you testify earlier that you weren't sure what a messaging engineer was –
A. That's correct
Q. -that you were simply a support engineer?
A. That's correct, because my business card shows support engineer.  So I don't know what a messaging engineer is.
. . .
Q. Okay.  So are you aware that other messaging engineers worked with you on your team, or is it your position that other support engineers worked on your team?
A. Well, no.  I would say that I was a support engineer because I was dedicated to FQE doing the basic work, that we had different varying level of expertise.   Those people might be considered messaging engineers.  I don't know how you define messaging engineer.  I'm not sure.
Q. So is it, is it your testimony that your position is distinguishable from Wayne Allen's position?
A. Not necessarily in the sense that he was – Wayne and I were the most probably the least trained people of anybody on the team in the sense that *we had no prior experience with IT*, *so we didn't have the skill level that the other people did.*  So we were given usually – that's why I was given FQE, dedicated to them, because it was an older antiquated system that wasn't that up to date, so it, it was basic, so I was assigned that to work with, and Wayne was given a lot of the other minor

23

details because his skill level wasn't as good either.
Q. Is it, is it your position that, Mr. Allen was also simply a support engineer as opposed to a messaging engineer?
A. I would say, yes, based on his skill level, just knowing what his skill level was.
. . .
Q. Did other people on the team also have a lack of IT knowledge, the same lack of knowledge that you and Wayne allegedly had, or were they more experienced with the IT industry?
A. No.  Mike Annen 20 years IT.  There was other people there that, that had more experience.  Jason Vest, he was – you know, they all had computer science degrees . . . These other guys, they did have computer science degrees and backgrounds in IT.

Exhibit 6 at 55:6-58:13.  Contrary to Cable's testimony, Plaintiffs had significant prior experience with IT and ETC hired them because of their significant experience.

Allen also suggested a distinction in the services provided by himself and the other support engineers:

Q. Did you modify computer systems through scripting?
A. No.
Q. Are you aware of whether other support engineers modified computers systems through scripting?
A. More experienced engineers may have.

Exhibit 17 at 48:16-29:1.

Plaintiffs' attempt to distinguish themselves from more experienced Support Engineers is a red herring.  Whether or not the other Support Engineers had more training, knowledge, and experience than Plaintiffs is not determinative of whether or not Plaintiffs were properly classified as exempt.  For example, a first year associate at a law firm is properly classified as exempt notwithstanding the fact that other attorneys at such a firm may be more experienced.  Exempt status, in the present context, is determined by an analysis of the primary duties of Cable and Allen as Support Engineers.

Furthermore, Plaintiffs' suggestion that they are entitled to recover under the FLSA since they allegedly were neither as experienced nor competent as the other Support Engineers is absurd.  Plaintiffs responded to the same issues as the rest of ETC's Support Engineers and were obligated to respond to

alerts and support requests during their respective On-Call Weeks, regardless of whether tickets concerned Office 365 or FQE.  No material distinction existed between Plaintiffs' roles and responsibilities and that of the other Support Engineers to justify classifying Plaintiffs as non-exempt and the other Support Engineers as exempt.

Plaintiffs have also suggested that ETC's employees do not personally know whether Plaintiffs were fulfilling their primary duties.  During Plaintiffs' deposition of Christian Stegh, ETC's Vice President of Sales & Strategy and Chief Technical Officer, ETC's Vice President of Sales & Strategy and Chief Technical Officer, the following exchange occurred:

> Q. So you don't have first-hand knowledge of what Mr. Cable did; you just have knowledge, looking at this, that reflects the various tasks that he performed for FQE; is that correct?
>  TURNER:  Objection
> THE WITNESS:  In aggregate, I knew what he was doing.  I had no idea what the 155 pages [Deposition Exhibit 3, First Quality Help Desk Tickets] looked like.
> . . .
> Q. What's your conclusion based on, that he needed to know how servers worked together and all that?
> A. This is just a prerequisite of being a systems engineer, as having some knowledge of the entire system, not just one component of it.  He had to know how these individual servers talked to one another, over a computer network, how the security works between them, if he made a change in one, does it trickle down into another.  If you envision a pyramid, Active Directory sits at the very top, and Lync and Exchange sit underneath it, so there's a trickle down, from what he would do, with Active Directory, that goes and feeds into those other applications or other servers.  So he needed to know how that worked with the interplay between all three.
> Q. Well, you say, he had to know, but you never worked with him on any such issues, isn't that correct?
>  TURNER:  Objection.
> THE WITNESS:  It was a requirement of the job, doing all these tasks; he would have to have known that.
> BY  ZIPIN:
> Q. What I'm saying is, that's your conclusion, but you never worked with him, in such a way that he demonstrated, for you, his knowledge of those systems; isn't that accurate?
>  TURNER:  Objection.
> THE WITNESS:  By closing these 155 pages of tickets, he knew exactly what I'm talking about.
> BY  ZIPIN:
> Q. Well, so you're saying that is your conclusion and your deduction, based on your analysis, but you never worked with him in such a fashion that you could see him demonstrate those skills;

isn't that correct?
 TURNER:  Objection.
THE WITNESS:  If by watching him over the shoulder, you're correct.  If by being in a
supervisory and in a position of knowing that he couldn't do his job, then I did know that, and
did work with him enough to know that he was doing that higher-level work for FQE.

**Exhibit 23**, Deposition Transcript of Christian Stegh at 35:11 – 41:4.  Plaintiffs' suggestion that other

ETC staff were unaware of their performance is disingenuous.  Clearly, if Plaintiffs were unable to fulfill

their duties, their incompetence would have been quickly discovered and they would have been

immediately terminated.  Instead, Plaintiffs worked at ETC for years.

### 2.   Plaintiffs Were Highly Skilled Computer Employees

In addition to the primary duties performed by the subject employees, the courts also consider the

skill level of the employee, including certifications held, and the relevance and importance of those skills

and certifications in the execution of the job.  Prior to his employment with ETC, Cable was employed by

Prometric as a Senior Software Test Engineer for eight years, from 2001 to 2009.  Exhibit 11.  As a Senior

Software Test Engineer, Cable tested graphical user interfaces and web-based applications written in

Visual Basic, Java, C++, .NET with Microsoft SQL Server back end.  *Id.* Cable supervised the

development of software test plans, test procedures and test cases based upon business and functional

requirements.  *Id.*  Cable obtained numerous IT certifications and received the following software training:

- OCSr2
- Lync 2010, 2013
- Audio Codes and Sonus (NET)
- Exchange 2007, 2010, 2013, UM
- Office 365
- Active Directory
- Windows Server 2003, 2008, 2012
- Wireshark
- ACsyslog
- Interactive Intelligence 4.0
- Interactive Intelligence Certified (ICCE4.0)

- Microsoft Lync 2014 Ignite

*Id.*

During his deposition, Cable testified concerning his duties as a Senior Software Test Engineer at

Prometric, Inc., where he worked from 2001 to 2009, prior to his employment at ETC.

Q. And how would you test the software?
A. Well, we had a lab. They would give us a – I would install it, and then run through the, through it to see if there were things working correctly.
Q. Now, what is Java C++?
A. It's another language.
Q. Okay. And .NET, is that another?
A. It's Microsoft language, too?
Q. Okay. And what does Microsoft SQL Server back end mean?
A. It's just the database that holds all of the information.
Q. Directing your attention to the second bullet it states, assumed a lead role in writing software test plans, test procedures and building test cases based on business and functional requirements, correct?
A. Um-hum.
Q. Please explain generally what steps you, you used to test software.
A. Well, we would be given requirements which are, as I've stated before, things that needed to be in the software, and then they would develop the software based on those requirements and then hand the software to us to make sure that they were in there.
Q. And if the requirements were not met, then you would identify the issues with the software and send it back to the, to the developers?
A. Um-hum. We'd put a, what's call a defect in; that's correct.

Exhibit 6 at 32:11-35:5.

Allen obtained the following IT Certifications prior to his employment with ETC:

- 70-680 – MCTS, Windows 7, Configuring;
- 70-685 – MCTS, Windows 7, Enterprise Desktop Support Technician;
- 70-662 – MCTS, Microsoft Exchange Server 2010, Configuring;
- 70-640 – MCTS, Windows Server 2008 R2 Active Directory, Configuring;
- 70-642 – MCTS, Windows Serer 2008 Network Infrastructure, Configuring;
- 70-643 – MCTS, Windows Server 2008 Apps Infrastructure, Configuring;
- 70-647 – MCTS, Windows Server Enterprise Administration
- 70-620 – MCTS, Windows Vista Client, Configuring
- CompTIA A+ Computer Repair and Network+
- BPOS-S Tier I Support

- Office 365 Tier II Support

Exhibit 11. Allen is a subject matter expert in Office 365. *Id.* During his deposition, Allen also acknowledged that he was providing Tier I and II support in his capacity as a Microsoft Subject Matter Expert, prior to his employment at ETC:

> Q. Directing your attention to your resume, the next to the last bullet point under the Teleperformance section indicates that you consulted with Microsoft Tier 3 technical support, correct?
> A. Correct.
> Q. Is it fair to say that you were providing Tier 1 and/or Tier 2 services while you were working at Teleperformance?
> A. More Tier 1, but it's fair to say that I was providing a certain portion of Tier 2, that we provide the entire contract. All the engineers provided both Tier 1 and Tier 2.
> Q. Would you have also provided Tier 3 services?
> A. Yes.

Exhibit 17 at 35:10-36:4.

Plaintiffs certainly had significant professional computer experience prior to their tenure at ETC. Nevertheless, once again, Plaintiffs have attempted to diminish their experience and skill level. Specifically, Allen modified his resume for the specific purpose of suggesting that he does not possess the skills that he acknowledged possessing before his employment at ETC. During his deposition, Allen testified as follows:

> Q. I'm going to show what I've marked as Exhibit 2. Do you recognize this document?
> A. Yes, I do.
> Q. Please identify it.
> A. This is a resume that I had prepared.
> . . .
> Q. Approximately when did you prepare this resume?
> A. I believe this resume was prepared after my termination from Enabling.
> . . .
> Q. Directing your attention to the second bullet point under the section concerning your tenure at Enabling Technologies, it states: Responding to requests for support from customers, help desk personnel, and *defendant's* own employees; correct?
> A. Correct.
> Q. Your reference to defendant refers to Enabling Technologies; correct?

28

A. Correct.
Q. You would not typically use the term "defendant" in a resume, correct?
A. Generally speaking, correct.
Q. So is it fair to say that this resume was prepared for the purpose of this lawsuit?
 ZIPIN:  Objection
A. Not for the purpose of this lawsuit, but in the context of this lawsuit I was asked to prepare a resume.

Exhibit 17 at 15:6-10, 16-19; 17:8 – 18:5 (emphasis added).

Allen's critical error in preparing a resume "in the context of this lawsuit" (the "Litigation Resume") is that he apparently forgot that he provided ETC with a copy of his resume when he applied there for employment (the "2012 Resume").  **Exhibit 24**, Resume of Wayne Allen, 2012.  His modification of the 2012 Resume is telling.  In the 2012 Resume, he identified himself as a "Tier II MSFT Subject Matter Expert."  *Id.*  In his Litigation Resume, he identified himself simply as a "MSFT Subject Matter Expert."   Exhibit 11.  The 2012 Resume included the following description of his duties at Teleperformance:

> *Acts as Technical Manager for a team of 15-20 support engineers* for Microsoft's BPOS-S and Office 365, which team consistently performed in the top tier of 30 teams.

Exhibit 24 (emphasis added).  In his Litigation Resume, he modified this description as follows:  "*Provides helpdesk support* for Microsoft's BPOS-S and Office 365 products.  Exhibit 11 (emphasis added).  Allen included the following description in his 2012 Resume:

> Works with *engineers* to troubleshoot difficult customer issues involving misconfiguration of desktop applications (XP, Win 7, Outlook and Lync), network and security issues and service interruption events.

Exhibit 24 (emphasis added).  In his Litigation Resume, Allen modified such description as follows:

> Works with *customers* to troubleshoot difficult customer issues involving misconfiguration of desktop applications (XP, Win 7, Outlook and Lync), network and security issues and service interruption events.

Exhibit 11 (emphasis added).

Allen's amendments to his 2012 Resume for the purpose of litigation are clearly a disingenuous attempt to diminish his skill level and establish that he was misclassified.

### 3. Most of ETC's Customers Have Internal Help Desks to Address Tier 1 Issues

The courts also consider whether a help desk (typically comprised of lower-level employees) exists to handle simple problems before they are escalated to the subject employee.  In this case, the vast majority of ETC's clients have internal help desk employees or computer support specialists who attempt to resolve the customer's IT issues internally.  Exhibit 3 at ¶ 24.  ETC's customers' help desk personnel attempt to resolve UM/UC issues, as well as other IT support issues.  *Id.* at ¶ 25.  Many of the issues handled by each customer's help desk personnel constitute low-level, or "Tier 1" issues.  *Id.* at ¶ 26.  If ETC's customers' help desk employees are unable to resolve a UM/UC issues, then the support specialist will escalate the issue to ETC's UC/UM Support Engineers.  *Id.* at ¶ 27.

For example, the National Association of Broadcasters ("NAB") has been an ETC customer for approximately 15 years.  **Exhibit 25**, Affidavit of Garry Darrell Poe at ¶ 4; see also **Exhibit 26**, Resume of Garry Darrell Poe.  NAB has an internal IT Department, which provides support to approximately 150 employees.  Exhibit 25 at ¶ 6.  The IT Department has the following IT employees who address help desk issues:  a) Help Desk Analyst; b) Network Administrator; and c) Office 365 Administrator.  *Id.* at ¶ 7.  Issues involving UC or UM are routed to NAB's Tier 1 Office 365 Administrator.  *Id.* at ¶ 9.  The Tier 1 Office 365 Administrator attempts to resolve the issue himself without assistance from ETC.  *Id.*  He is able to resolve basic UC/UM issues, such as malfunctioning phones or devices, locked computers, user issues, or software problems.  *Id.*  However, if the Tier 1 Office 365 Administrator is unable to resolve the support request, the issue is escalated to ETC.  *Id.* at ¶ 10.  All tickets that are directed to ETC's Support Engineers by NAB are complex issues, which constitute "Tier 2" or "Tier 3" issues.  *Id.*

During his deposition, Cable acknowledged that FQE had its own internal help desk personnel. Exhibit 6 at 74:6-8.  Allen also acknowledged that many of ETC's customers have their own internal help desk personnel.  Exhibit 17 at 54:4-7.  This further undermines Plaintiffs' claim that they merely provided Tier 1 support.

**4. Plaintiffs Used Initiative, Knowledge, Creativity, Strategy, and Independent Judgment in the Execution of Their Job Responsibilities**

The courts also consider the level of initiative, creativity, and strategy allowed the employees in the execution of their job responsibilities.  Plaintiffs assert that they were provided little discretion in the execution of their work duties.  Doc. No. 27-3 at 10, 15.  Plaintiffs also claim that they were provided a script that they were obligated to follow when responding to support requests.  *Id.* at 2.  Plaintiffs have attached a manual entitled Troubleshooting Lync Server 2010 Clients as Exhibit 4 to their Motion for Summary Judgment, and claim that such manual was provided by ETC as a script.  *Id.*  Similarly, Plaintiffs claim that they relied on checklists.  *Id.*

Plaintiffs' assertions are simply false.  ETC does not provide each Support Engineer with resources, guides, or scripts that they are obligated to follow.  Exhibit 3 at ¶ 36.  Plaintiffs' Exhibit 4 is a troubleshooting manual for client issues, which could be utilized by a customer's internal IT team so that they have an idea of how to remediate on their own.  **Exhibit 27**, Supplemental Affidavit of William Fannin at ¶ 1.  Neither this manual nor any subsequent version of it would be used by the Support Engineers.  *Id.*  Plaintiffs' claim that ETC provided them the Troubleshooting Lync Server 2010 Clients manual is a misrepresentation.  *Id.*

Support Engineers are required to use initiative, knowledge, strategy, and independent judgment in executing their job responsibilities.  **Exhibit 28**, Affidavit of Michael S. Annen at ¶ 9; **Exhibit 29**,

Affidavit of Aaron J. Hauber at ¶ 11; **Exhibit 30**, Affidavit of Christian Stegh at ¶ 8.  In fact, the Support

Engineers have the discretion and autonomy to use any credible resource that may be beneficial to

resolution of an issue.  Exhibit 3 at ¶ 36.  Such resources may include, but do not necessarily include,

Google or TechNet.  *Id.*  Furthermore, contrary to Plaintiffs' claims, FQE did not provide ETC a guide

concerning the resolution of UC/UM issues.  *Id.*  Rather, FQE provided a guide that outlined policies for

managing tickets and accessing FQE's environment.  *Id.*; Exhibit 4.

ETC also does not provide its Support Engineers with checklists concerning ticket resolution.

Exhibit 3 at ¶ 36.  Once again, the Support Engineers have the discretion and autonomy to create their

own checklist or any other personalized process that they believe might be beneficial.  *Id.*  ETC also does

not provide the Support Engineers with checklists to test updates.  *Id.*

While Allen and Cable may have developed their own checklist or processes to resolve issues,

ETC did not dictate what process they were obligated to follow.   Rather, the Support Engineers are

expected to use their initiative, knowledge, creativity, strategy, and independent judgment to resolve

support issues.

### 5.  Plaintiffs' Compensation Was Similar to the Compensation of Computer Systems Analysts in Their Respective Geographical Areas

The courts also consider the compensation of the subject employees in determining the

applicability of the Computer Employee Exemption.  Plaintiffs' respective salaries were higher than the

average salary of computer support specialist or "help desk" employees within their geographical region.

Exhibit 2 at ¶ 22.  Their salaries were similar to the salaries of computer systems analysts.

Allen worked remotely from Boca Raton, Florida.   Allen's starting base salary, as an entry-level

UM/UC Support Engineer, was $52,500, which increased to $55,125 on or about October 15, 2013.

Exhibit 5 at ¶ 11.  In addition to his base salary, Allen also received additional compensation of $350 -

$400 each week he was on-call.  *Id.*  The average wage for an entry-level computer support specialist in

Florida in 2012 was $13.81 per hour or $28,724.80 per year.  **Exhibit 31**, Florida Wage Survey, 2012 at

ETC008406.  The average wage of a computer systems analyst in Florida in 2012 was $28.14 per hour or

$58,531.20 per year.  *Id.*  The average wage of an entry-level computer support specialist in Florida in

2013 was $13.58 per hour or $28,246.40 per year.  **Exhibit 32**, Florida Wage Survey, 2013 at ETC008428.

The average wage of a computer systems analyst in Florida in 2013 was $26.94 per hour or $56,035.20

per year.  Accordingly, Allen's salary was similar to a computer systems analyst, rather than a computer

support specialist or "help desk" employee.

Cable worked for ETC as a Support Engineer from December 14, 2009 to August 2014.  Exhibit

5 at ¶ 4.  Cable's starting base salary was $63,000.  *Id.* at ¶ 5.  Cable's salary increased to $66,780 on or

about April 15, 2011, increased to $70,787 on or about April 15, 2012, and increased to $74,326.35 on or

about October 15, 2013.  *Id.*  Thus, in 2014, when Cable was an experienced UC/UM Support Engineer,

he was earning $74,326.35 per year, plus his additional compensation for On-Call Weeks.  In 2014, the

median wage for computer support specialist in Maryland was $51,230 per year.  The median wage for

computer systems analyst in Maryland was $87,777 per year.  **Exhibit 33**, Maryland Occupational Wage

Estimates, Maryland, 2014.  In 2014, in Baltimore County, where Cable resides, the media wage for

computer support specialist was $47,239 per year.  **Exhibit 34**, Maryland Occupational Wage Estimates,

Baltimore County, 2014.  The median wage for computer systems analyst in Baltimore County was

$86,967.  *Id.* With the additional annual compensation of $3,000 - $4,000 for On-Call Weeks, Cable's

salary was also similar to a computer systems analyst, rather than a computer support specialist.  Thus,

Plaintiffs' compensation also indicates that they qualified for the Computer Employee Exemption.

### 6.   Plaintiffs Managed a Substantial Volume of Data

In assessing the applicability of the Computer Employee Exemption, the courts consider the volume of data that the employee managed.  In the instant case, ETC's support customers have increased from 54 to 61 since 2012.  Exhibit 3 at ¶ 18.  During Plaintiffs' tenure with ETC, the Support Engineers supported between 450 and 475 servers.  *Id.* at ¶ 57.  Furthermore, ETC's ticket queue in Kaseya generally averages 100 tickets during regular hours, which are divided between 4-5 Support Engineers.  *Id.* at ¶ 58.  Thus, Plaintiffs each managed a substantial volume of data during their respective tenures at ETC.

### 7.   Plaintiffs Supported Thousands of Employees

Courts also consider the number of users the employee supported.  Generally, ETC does not directly support users since ETC provides limited Tier 1 support.  Nevertheless, as previously stated, during Plaintiffs' tenure with ETC, the Support Engineers supported between 450 and 475 servers, which impacts the users that access such servers.  *Id.* at ¶ 57.  While the Support Engineers do not always provide support directly to end users, by virtue of supporting the Lync environment for more than 60 customers, Plaintiffs indirectly provided support to thousands of individuals.  *Id.* at ¶ 59.

### 8.   The Services Provided by the Support Engineers are Critical to the Success of ETC

Courts also consider the priority of the employee's work relative to the overall work of the company.  As previously stated, ETC provides support services to more than 60 customers.  The support services provided by ETC are critical to ETC's customers.  Exhibit 27 at ¶ 2.  If an issue occurs with a customer's server or unified communication system, the customer may not be able to function.  *Id.* at ¶ 3.  ETC's Support Engineers ensure that issues are addressed in a timely manner and that customers' systems are updated, which significantly reduces business interruption.  *Id.* at ¶ 4.  Support Engineers are critical to the success of ETC and constitute one of the most important services that ETC provides to its customers.

*Id.* at ¶ 5.

### B. The Evidence Clearly Establishes That Plaintiffs Qualified for the Computer Employee Exemption and Were Properly Classified as Exempt Employees, and ETC is Entitled to Judgment as a Matter of Law

As previously discussed, in order to qualify for the Computer Employee Exemption, three elements must be satisfied:  1) the employee must be compensated at a rate of at least $455 per week on a salary basis or paid on an hourly basis, at a rate of not less than $27.63 per hour; 2) the employee must be employed as a computer systems analyst, computer programmer, software engineer, or other similarly skilled worker in the computer field; and 3) the employee's primary duties must include the duties outlined in 29 USC § 213(a)(17).  *See* 29 U.S.C. § 213(a)(17).

In the instant case, there is no dispute that the first prong is satisfied.  Cable's starting base salary was $63,000 and increased to $74,326.35.  Exhibit 5 at ¶ 5.  Thus, he earned $1,211.54 or more per week throughout his employment at ETC.  Allen's starting base salary was $52,500, which increased to $55,125.  *Id.* at ¶ 11. Thus, Allen earned $1,009.62 or more per week.  Both Plaintiffs, therefore, were compensated at least $455 per week.

As Support Engineers, Plaintiffs also had skills similar to a computer systems analyst.  According to Christopher L. Dean, both Support Engineers and computer systems analysts consult with managers of customers to determine the role of the IT system of the organization.  Exhibit 2 at 11.  Both positions devise ways to add new functionality to existing computer systems, conduct testing to ensure the systems work as expected, and train the system's end users and write instructions to assist their customers.  *Id.*  Both Support Engineers and computer systems analyst are responsible for an immense volume of data.  *Id.*  Both Support Engineers and computer systems analysts generally receive compensation greater than the compensation typically received by a computer support specialist or mere "help desk" employee.  *Id.*

35

During Plaintiffs' deposition of William Fannin, ETC's Support Manager, and both a fact witness

and a second designated expert in this matter, Fannin testified about Plaintiffs' skills:

Q. So I was asking about the beginning of the sentence, in the middle of page two [of Deposition Exhibit 2, Expert Witness Designation], it says,  Fannin is expected to testify that UM/UC support engineers regularly consult with managers of customers, to determine the role of the IT system in the organization; would that be your testimony?
A. Yes.
Q. Okay.  Now, do you know whether Howard Cable did that, whether he regularly consulted with managers of customers, to determine the role of the IT system in the organization?
A. He was always on the manager call with us.  That was, every Thursday, we had a management call, with their management, and if changes came up, they looked to him for advice.
. . .
Q. How about the next portion of this, where you say, oversee the installation and configuration of new systems, to customize them for their customers; is that also referring to UM/UC support engineers generically?
A. Correct, but Wayne did shadow a lot of implementations.
Q. And we're not talking about patches or upgrades; we're talking about something beyond that?
A. We did all the patching and upgrades, but even for the regular implementation, the initial install, we would shadow.
. . .
Q. And the next phrase, you have, conduct testing to ensure the systems work as expected.  Is that again, referring to the generic UM/UC support engineers, what they did?
A. It is, but we always test it, post maintenance, post any type of installation, updates, anything.
Q. And do you know of any instances where Wayne Allen did that?
A. Any time you had maintenance, anytime you had any type of maintenance window, you had to make sure you test and back up, before you move on to the next.
Q. And maintenance is, what, is it the upgrades or patches?
A. Both.
Q. Upgrade or patch, but the support engineer, Wayne Allen, or anyone else, would conduct some test to make sure it works?
A. Correct.
Q. Then the last thing you wrote in (sic) is, train the systems' end users and write instructions to assist their customers.  Is that again referring to UM/UC support engineers generically?
A. It is, but that's – you know, everybody does that.
Q. So do you have any instance where Wayne Allen trained the systems end users and wrote instructions to assist the customers?
A. He was always – one of the accounts he was always working with was Ewing Cole; he trained them a lot on how to operate 365.
. . .
Q. So it's your testimony, for Ewing Cole Wayne Allen trained the systems' end users and wrote

instructions to assist them?
A. Correct.  Kenneth Cole as well.

**Exhibit 36**, Transcript of Deposition of William Fannin at 47:10 - 48:4; 50:20 - 51:11, 20-21; 52:1 - 53:21.

Similarly, during Plaintiffs' deposition of Christopher Dean, the following exchange occurred concerning the Computer Employee Exemption:

Q. And what gives you reason to think they understood computer hardware well enough to qualify, in your definition, as computer systems analysts?
 TURNER:  Objection.
THE WITNESS:  Based on the tickets I read, based on the text in those tickets, they had an understanding of the computer systems they were supporting.
BY ZIPIN:
Q. And can you give me an example of what you're talking about?
A. Sure.  I can't reference a specific tickets, because it's in my memory, but I can tell you, generally speaking, in order to resolve the help desk ticket – let me think of a good example.  I believe there was one ticket that referred to telephone numbers that were supposed to be blocked, that were not being blocked.  So the client, for Enabling Technologies, had a system that – a telephone system, and they wanted certain numbers blocked so that they wouldn't be able – incoming calls would not be able to come into the system, and one of the engineers, Mr. Allen, I think, had a long description, in the ticket, about the configuration necessary to block this and something necessarily wasn't working.  The client thought they had set it up properly to block the number, but the number was still coming through, and Mr. Allen was able to get in and take a look at the system and figure out what was wrong and resolve the issue.
. . .
Q. So do you recall another example where either one of them showed a familiarity with hardware and hardware analysis?
A. Yes.  There was one ticket that had to do with an exchange mail server and there was another that had to do with a messaging appliance, which is a customer piece of hardware that routes phone calls, and so they had to have at least a general understanding of how those worked to troubleshoot.
Q. And when you say, they had to have a general understanding, do you know whether they did the troubleshooting or whether they asked for help, from someone who might have had a more sophisticated understanding?
A. Based on the tickets that I reviewed, it was a combination.  On some tickets, they would go in and make configuration changes and make recommendations.  On some other tickets, they had to escalate, because they tried a few things, they didn't work and they were not able to resolve the issue.

**Exhibit 37**, Deposition Transcript of Christopher Dean at 35:21 - 37:15; 38:10 - 39:10.

The testimony of ETC's expert and fact witnesses, as well as the analysis of the numerous factors discussed *supra*, clearly establish that Plaintiffs possessed skills similar to the skills of a computer system analyst.  Importantly, Plaintiffs have not designated any expert witnesses in this matter.  Furthermore, if Plaintiffs maintain their position that they were merely low-level "help desk" employees, they are not qualified to offer any opinion concerning whether or not they have a skill level similar to a computer systems analyst.  As a result, Plaintiffs are unable to rebut the opinions of ETC's expert witnesses with any competent material evidence.

In order to qualify for the Computer Employee Exemption, the employee must also perform the following duties:

a. The application of systems analysis techniques and procedures, including consulting with users, to determine hardware, software or system functional specifications;

b. The design, development, documentation, analysis, creation, testing or modification of computer systems or programs, including prototypes, based on and related to user system design specifications;

c. The design, documentation, testing, creation or modification of computer programs related to machine operating systems; or

d. A combination of the aforementioned duties, the performance of which requires the same level skills.

The analysis of the numerous factors discussed *supra* and the documents attached hereto clearly establish that Plaintiffs' primary duties consisted of the application of systems analysis techniques, including consultation with users to determine hardware, software, and/or system functional specifications.  Exhibit 2 at ¶ 16, 19; Exhibit 3 at ¶ 42, 47.  Plaintiffs also analyzed, tested, and/or modified computer systems or programs based on and related to user or system design specifications or machine operating systems.  *Id.*  Plaintiffs were responsible for the support of highly complex UM and UC

integrations, solving technical problems, working with vendors to track and manage issue resolution, and interacting with ETC's field engineers, employees, and users.  *Id.*

Plaintiffs' claim that they were low-level "help desk" employees simply is not credible.  Plaintiffs were properly classified as exempt employees under the Computer Employee Exemption.  The evidence establishes that no genuine dispute of material fact exists and ETC is entitled to judgment as a matter of law.

### C. Assuming *Arguendo* That Plaintiffs Were Misclassified as Exempt Employees, They Have Grossly Inflated the Number of Hours of Overtime They Worked; at Most, Plaintiffs Only Worked an Average of 50 – 60 Hours During On-Call Weeks

Plaintiffs each claim they worked an average of fifty-and-one-half (50.5) hours per week during Regular Weeks and ninety-two (92) hours per week during On-Call Weeks.  Doc. No. 27-3 at 24.  In an FLSA action, the plaintiff carries the burden of proof in establishing the number of hours actually worked.  *Randolph v. PowerComm Constr.*, Inc., 209 F.R.D., 349, 362 (D. Md. 2015).  When an employer fails to maintain timekeeping records, the employee must produce "'sufficient evidence to show the amount and extent of [ ] work as a matter of just and reasonable inference.'"  *Id.* (quoting *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946)).  If the employee does so, the employer carries the burden of either introducing "evidence of the precise amount of work performed" or introducing evidence "to negate the reasonableness of the inference to be drawn from the employee's evidence."  *Id.*

Here, since ETC did not maintain timekeeping records, Plaintiffs contend that their testimony and documentary evidence regarding the number of hours worked is determinative and that ETC is unable to refute Plaintiff's evidence.  On the contrary, due to their inconsistent claims concerning the number of hours worked, Plaintiffs have failed to produce sufficient evidence to show the amount and extent of work as a matter of just and reasonable inference.  Furthermore, even assuming that Plaintiffs satisfied their

burden, ETC's evidence negates any reasonable inference to be drawn from Plaintiffs' evidence.

### 1. Plaintiffs Have Failed to Produce Sufficient Evidence to Show the Amount and Extent of Work as a Matter of Just and Reasonable Inference

In the Complaint, while Plaintiffs distinguished between Regular Weeks and On-Call Weeks, they failed to distinguish between the alleged average number of hours worked during Regular Weeks and On-Call Weeks.  Doc. No. 1/0 at ¶ 9.  Rather, Plaintiffs stated that they typically and customarily worked approximately sixty (60) hours per week.  *Id.* at ¶ 11.  Importantly, at the time of filing the Complaint, Plaintiffs did not assert that they worked 50.5 hours during Regular Weeks or 92 hours during On-Call Weeks.

In the Circuit Court Litigation, Gilmer, the former supervisor of Allen and Cable, attempted to assist his former colleagues.  In Response to Interrogatory No. 23, which requested information pertaining to the stolen customer's server and network, in pertinent part, Gilmer gratuitously stated:

> I also knew that the engineers were not being paid according to the work they were performing. I went to Bill many times asking for extra On Call money, since the team was *putting in an average of 60 hours per week* **when on call** covering hundreds of clients and systems.  He would not provide the extra money or pay them hourly which is another reason I wanted to help them by performing the work.

**Exhibit 37**, Defendant's Answers to Plaintiff's Exceptions to Defendant's Discovery Responses at 7 (emphasis added).  Thus, according to Gilmer, Plaintiffs were working an average of 60 hours per week during On-Call Weeks.  During his deposition in the Circuit Court Litigation, Gilmer reiterated his position:

> Q. So the support engineers would work approximately 40 hours during the regular workweeks, but would work an average of 20 additional hours of overtime during the on-call periods?
> A. Average, yes.  I would say probably 15 to 20 extra hours.  15 would probably be the lowest and 20 would probably be about the average . . .
> . . .
> Q. Before the break we were talking about Mr. Allen and Mr. Cable, and you testified that while

you supervised them they would work approximately 40 hours during regular workweeks and then on-call weeks they worked an average of 60 hours, which could have been more than 60, but over a period of several months, it would have averaged out to be 60 hours during on-call weeks, correct?
A. Yes.

**Exhibit 7**, Vol. I at 189:10-17; 201:19 - 202:7.   Gilmer's testimony suggests that Plaintiff's reference to

60 hours in the Complaint referred only to On-Call Weeks, rather than an average of the alleged hours

worked during On-Call Weeks and Regular Weeks.

Subsequent to filing the Complaint, Plaintiffs decided to grossly inflate the number of hours they

worked each week.  Plaintiffs did so by claiming that the 60 hour estimate appearing in the Complaint is

an average of hours worked per week when combining On-Call Weeks and Regular Weeks. Under this

logic, Plaintiffs now assert that they both happened to work an average of 50.5 hours during Regular

Weeks and both happened to work an average of 92 hours during On-Call Weeks.

Plaintiffs have continued to inflate the number of hours they worked throughout this matter.

During Cable's deposition, he increased the alleged average number of overtime hours during On-Call

Weeks to 74 hours.  Thus, Cable's latest position that he worked an average total of 114 hours during On-

Call Weeks:

> Q. If you were to approximate, approximately how many hours of overtime did you work each day after 5:00 p.m. when you were on call?
>  ZIPIN: Object to the form of the question.
> THE WITNESS:  Maybe – it's hard to say.  Ten hours maybe, rough estimate.  Like you said, I'm just approximating.
> Q. Ten hours of overtime?
> A. (Nodding head yes).
> Q. I'm sorry, you're going to have to say something –
> A. Yes.
> . . .
> Q. Okay.  So approximately how many hours of overtime did you work on Saturdays during on-call weeks?
> A. Well, the whole day and night.  So how many hours is that?
> Q. Is it your testimony that you worked 24 hours?

A. I would say that I worked all day, which is eight hours, and then at night, another few hours. So ten hours I would say, and even longer.  Saturday nights – actually, a lot of my – the more I think about it, Saturday nights there was a lot of scheduled maintenance.   For one client in particular, they always wanted theirs done Saturday night at 11:00 I had to start.  So every – if you're on call, every, you can count on working Saturday night at 11, starting at 11 for a scheduled maintenance, and then, of course, there's always stuff coming in during the day in FQE.

Q. Okay.  So is it ten hours, or would you testify that it's, that it's more than ten?

A. It could be more.  It varied every time you were on call.

Q. If you were to –

A. I can't approximate.

Q. Well, you approximated for the suit.  When you filed your Complaint –

A. Right.

Q. - you gave an approximation.

A. Right.

Q. So what's your approximation of Saturdays, how many hours?  Ten hours or more?

A. Probably more than that even. . . .

Q. Okay.  So would you say 12, 12 hours?

A. Yeah, I would say.

Q. Okay.  And what about Sundays during –

A. The same thing.

Q. Okay.  So let me ask the question.  During on-call weeks, approximately how many hours of overtime would you work on Sundays?

A. Well, I would be looking at FQE.  I would be looking at alerts.  I would be looking at any scheduled maintenance, any unexpected issues.

Q. And approximately how much time?

A. I would say 12 hours.

Q. Twelve hours again on Sundays?

A. Um-hum.

Q. Okay.  Just to make sure I'm clear, your testimony is during on-call weeks during the weekdays, you would work approximately ten hours of overtime each day, correct?

A. I would say that's probably right.

Q. Okay.  And then on Saturdays, you would work an additional 12 hours?

A. Right.

Q. And then on Sundays, you would work an, an additional 12 hours, correct?

A. Um-hum.

Exhibit 6 at 165:8-166:1; 167:2-169:12.

Cable also increased the number of hours he allegedly worked during Regular Weeks.  In his

Answers to Interrogatory No. 9, Cable indicated that he generally started working at 8:30 a.m.:

I typically worked 50 hours per week during each Regular Week in supporting ETC's clients, including some time after hours and on weekends.  Start time during a Regular Week was typically 8:30 a.m. EST and I usually worked until 5:30 p.m. EST. I did not take a break for lunch, and typically worked an additional 5 hours either at nights or on the weekends to continue to try to resolve customer issues.  This brings my total hours worked in a Regular Week to 50 hours.

**Exhibit 38**, Howard Cable's Answers to Interrogatories at 3-4.  However, during his deposition, Cable adopted the position that he worked before ETC's office opened:

Q. And when you worked remotely, what time did you start working?
A. Probably about 7.  7, 7:30.
Q. And why did you start at 7 or 7:30?
A. Because I wanted to make sure that the – like I said, I was dedicated to FQE, so I would check FQE's queue the night before, work any tickets that I could real quick if it was building up, and then I'd check in the morning before the 8:30 meeting just so I wouldn't be behind because I know stuff comes in during the night. . .

Exhibit 6 at 116:6-117:2.

Cable later revised his position on when his workday would conclude on Regular Weeks:

Q. Directing your attention to your answer to Interrogatory Number 9, and specifically let me direct your attention to page 4, the first paragraph at the top of the page.
A. Um-hum.
Q. You state, start time during a regular week was typically 8:30 a.m. Eastern Standard Time and I usually worked until 5:30 p.m. –
A. Right.
. . .
Q. Why did you continue to work from, after the office closed between 5 and 5:30 p.m.?
A. I was dedicated to FQE, and if I did not continue to check their queue, the tickets would build up, and I would be behind, and I would never be able to catch up.  And there would just be a - it would be a pattern that would be worsening and worsening because of the sheer volume of tickets.
Q. Okay.  So you'd (sic) typically would, would work an additional half an hour?
. . .
THE WITNESS:  Yeah, I actually worked a lot later than that.  After I sat down and realized – when I started really thinking about all of the hours I put in, I realized that that is a, is too low a number.
 TURNER:
Q. Okay.  So you didn't sit down and think about the number of hours you worked before you executed your Answers to Interrogatories?

43

A. No.  I, I did, but then I started remembering other things that I had done, which I, when I wrote this up that, I, I couldn't remember, but then I started thinking about the other, all of the other stuff I had done.

Q. Got you.  Okay.  So years later, after you allegedly worked this overtime, you started to remember additional things?

A. Yeah, the trauma of it all.  It came back to me.

Q. Okay.  Okay.  So your answer to Interrogatory Number 9 is, is inaccurate based on your testimony here today.  So what time would you say you usually worked during a regular week?

A. Well, like I said, it would be – I was dedicated to FQE.  So in the morning, I would check tickets, and at night, I would check tickets and all throughout the day.

Q. At what time would you, would you stop working?

A. There was no such thing as stop working because my wife would come home.  We – I would work until she came home.  We would eat, and then I would go back upstairs, check the queue and see if any new tickets came in.  If nothing, great.  If the tickets were there, I would work them, and it was like that every day, day in and day out.

Q. Okay.  So your testimony is that you would start working around 8:30 a.m. and you would usually stop working around 7:00 p.m., correct?

 ZIPIN:  Object, object to the form of the question.

THE WITNESS:  That's correct.

. . .

Q. Directing your attention back to your answer.  You also state that you typically worked an additional five hours either at nights or on the weekends to continue to try to resolve customer issues, correct?

A. Right.

Q. Okay.  And the reference to five hours, does that include the two hours between 5 and 7:00 p.m. that you just testified to today, or is the five hours additional time?

A. That's additional.

Q. Okay.  And is it your testimony still that you worked an additional five hours during regular work weeks, or do you want to change that number today as well?

A. Yeah.  I want to – basically, after really reviewing these answers and realizing that was actually underestimating my hours, I really started thinking back literally, Oh, my God, all the times I woke up in the morning and would go up there and check the queues, the times I went up there at night before I went to bed, working till dinner time, after dinner checking it, yeah, I realized I underestimated the hours severely actually –

Q. Okay.

A. - and the sheer amount of email alerts alone, alone was overwhelming, but anyway.

Q. So sitting here today, what would your estimate be of the additional hours you allegedly worked during [regular] weeks?

A. Probably 60.

Q. Sixty total?

A. Yeah.  Sixty total, right?

Q. Okay.  But per, per night?

A. It varied if there was tickets, how many tickets . . .

Q. In your answer to interrogatory, you said an average of five, five additional hours during the regular work week.  So you were able to give me an estimate in your Answers to Interrogatories.
A. Right.
Q. So, so sitting here today, what is your estimate of the additional number of hours you worked during regular work weeks?
 ZIPIN:  Objection.  It's been asked and answered.
THE WITNESS:  I agree.
BY MR. TURNER:
. . .
Q. Okay.  So for the purpose of, of your cause of action, you, you necessarily have to allege a certain number of hours that you worked overtime?
A. Right.  It would be more than that.
Q. Okay.  So what would that number be?
A. I would say –
 ZIPIN:  Objection.  It's been asked and answered.
THE WITNESS:  Yeah, I would say easily – okay.  We're talking about not on call, correct?
BY MR. TURNER:
Q. Correct.  During regular weeks.
A. You would have to add 40 – about an 80-hour week, roughly.
Q. And that's the total number of hours worked –
A. Right.
Q. - in the week?
A. Yes.
. . .
Q. Okay.  So your testimony today is you worked approximately 40 hours of overtime during regular weeks, correct?
A. That's correct.

Exhibit 6 at 196:2 -10; 196:20-197:9; 197:19-199:21; 202:12-205:4; 205:14-206:20; 207:5-7.  Thus, Cable has adopted the position that he worked an average of 80 hours during Regular Weeks and worked an average of 114 hours during On-Call Weeks.   Furthermore, Allen apparently appreciated Cable's claim that he worked until 7:00 p.m., the time in which his wife purportedly arrived home from work, as Allen has adopted the same position in this matter.  *See* Exhibit 17 at 105:14-21.

> **2.   Assuming *Arguendo* That Plaintiffs Have Satisfied Their Burden, ETC's Evidence Negates Any Reasonable Inference to be Drawn from Plaintiffs' Evidence**

Even assuming *arguendo* that Plaintiffs satisfied their burden, ETC's evidence negates any reasonable inference to be drawn from Plaintiffs' Evidence.   According to the numerous statements provided by ETC's employees, Support Engineers work approximately 40 hours or less during regular weeks and work between 40 – 60 hours during On-Call Weeks.   *See* Exhibit 28; Exhibit 29; Exhibit 30.

Plaintiffs' grossly inflated estimate of overtime hours is also belied by ETC's records.  Since 2012, ETC's support customers have increased from 54 to 61.   Exhibit 3 at ¶ 18; **Exhibit 39**, ETC Customer List.   ETC has operated with approximately the same number of Support Engineers throughout 2015 as it had from 2012 through 2014.  *Id.* at ¶ 32.   During Plaintiffs' tenure with ETC, ETC employed 3-5 Support Engineers.  *Id.*   Similarly, throughout 2015, ETC employed 4-5 Support Engineers.  *Id.* Additionally, the scope of services provided to ETC's customers has remained constant since 2012.  *Id.* at ¶ 20.  The number of customers receiving support after hours under the aforementioned contracts or by paying an hourly rate for after-hours services has remained constant or increased since 2012.  *Id.* at ¶ 21. Accordingly, ETC's volume of business has increased or, at the very least, remained constant since January 2012.  *Id.* at ¶ 22.  As a result, the number of overtime hours that Support Engineers must work is the same or greater than the number of hours that Support Engineers worked during Plaintiffs' respective tenure with ETC.  However, even with the increased workload, ETC's Support Engineers confirm working an average of 40 hours or less during Regular Weeks and only 50 – 60 hours during On-Call Weeks.

In or around January 2015, each Support Engineers began to track their hours in order for ETC to obtain additional information concerning the time that Support Engineers were devoting to each client. *Id.* at ¶ 11; **Exhibit 40**, ETC's Timekeeping Records, 2015.  The timekeeping records reveal that not a single Support Engineer ever worked anywhere near 92 hours in 2015.  Indeed, the most hours worked during any On-Call Week in 2015 was 55.75.  *See id.*  ETC's Timekeeping Records confirm that Plaintiff's

claim that they worked an average of 50.5 hours during Regular Weeks and 92 hours during On-Call Weeks is completely fabricated.

ETC's records further undermine Plaintiffs' position since Plaintiffs were obligated to close tickets after they reviewed or addressed them.  Throughout 2014, Cable closed a total of five tickets after 5:00 p.m.  *See* Exhibit 19.  The records indicate that Cable often did not perform work after 5:00 p.m. during On-Call Weeks, unless he was performing scheduled maintenance.  *See* **Exhibit 41**, Howard Cable's On-Call Records.  The records indicate that Cable often would not address tickets afterhours during the On-Call periods.   Instead, Cable often would address tickets the following morning during the regular workday.  The records also indicate that Gilmer periodically closed tickets for Cable.  Indeed, FQE's Big Web records indicates that, from July 2012 to through August 2014, out of a total of 2048 tickets, Cable closed only 32 tickets afterhours.  *See* **Exhibit 42**, FQE's Big Web Records for Howard Cable.

With respect to Allen, between October 8, 2014 and December 1, 2014, Allen worked an aggregate of approximately 2 hours of overtime during Regular Weeks.  *See* **Exhibit 43**, User Activity Report, Wayne Allen.  ETC's records also establish that Allen did not respond to each alert as it was received in real time.  Rather, Allen would periodically review alerts and would close numerous alerts at one time. *See* **Exhibit 44**, Wayne Allen's On-Call Records.  Thus, Allen's suggestion that he constantly responded to alerts in real time during On-Call Weeks is a misrepresentation.

ETC's Support Engineers, including Plaintiffs, have never worked an average of 50 hours during Regular Weeks and 92 hours during On-Call Weeks.  ETC's evidence certainly negates any reasonable inference to be drawn from Plaintiffs' Evidence.  At most, Plaintiffs' worked an average of 40 hours during Regular Weeks and 50-60 hours during On-Call Weeks.

**D. Assuming *Arguendo* That Plaintiffs Were Misclassified as Exempt Employees, Plaintiffs Are Not Entitled to Liquidated or Treble Damages and the Applicable Statute of Limitations Under the FLSA is Two Years**

    **1.  Plaintiffs Are Not Entitled to Liquidated Damages Because ETC Acted in Good Faith and Reasonably Believes That it Has Not Violated the FLSA**

The FLSA provides that an employer who violates the overtime provision "shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages." 29 U.S.C. § 216(b).  Congress under the Portal-to-Portal Act, however, has granted the district courts discretion to withhold liquidated damages under certain limited situations:

> If the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the [FLSA] the court may, in its sound discretion, award no liquidated damages or award any amount thereof not to exceed the amount specified in 29 U.S.C. § 216(b)].

29 U.S.C. § 260.

In this case, based upon the factors discussed *supra*, Plaintiffs were properly classified as exempt employees pursuant to the Computer Employee Exemption.  However, even if the Court were to find that the Plaintiffs were misclassified, Plaintiffs' training, knowledge, experience, and primary duties certainly suggest that ETC acted in good faith and with a reasonable basis to classify its Support Engineers as exempt employees. Furthermore, ETC has never been involved in a FLSA dispute and no employee has ever suggested that he or she was misclassified as an exempt employee.  Exhibit 1 at ¶ 4.  Thus, assuming the Court were to find that Plaintiffs were misclassified, Plaintiffs are not entitled to liquidated damages.

    **2.  Plaintiffs Are Not Entitled to Treble Damages Because a *Bona Fide* Dispute Exists Over Whether the Alleged Wages Are Due**

Section 3-507.1(b) of the Labor and Employment Article of the Annotated Code of Maryland:

*Award and costs.* -- (1) If, in an action under subsection (a) of this section, a court finds that an employer withheld the wage of an employee in violation of this subtitle and not as a result of a bona fide dispute, the court may award the employee an amount not exceeding 3 times the wage, and reasonable counsel fees and other costs.

A *bona fide* dispute exists if there is a "legitimate dispute over the validity of the claim or the amount that is owing" and a dispute over "whether there [is] sufficient evidence adduced to permit a trier of fact to determine that [the employer] did not act in good faith when it refused to pay" the wages at issue. *Admiral Mortg., Inc. v. Cooper,* 357 Md. at 533, 543 (2000).

In the instant case, a *bona fide* dispute exists concerning whether Plaintiffs are entitled to overtime wages. Furthermore, assuming *arguendo* that Plaintiffs were ineligible for the Computer Employee Exemption, a *bona fide* dispute exists concerning the amount of wages actually due since Plaintiffs have grossly inflated the number of hours they allegedly worked during their tenure at ETC. Accordingly, Plaintiffs are not entitled to treble damages.

### 3.  The Applicable Statute of Limitations is Two Years

Generally, the FLSA contains a two-year statute of limitations on actions to enforce its provisions, but allows that "a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued." 29 U.S.C. § 255(a). "Plaintiffs bear the burden of proving a willful FLSA violation." *Desmond v. PNGI Charles Town Gaming, L.L.C.*, 630 F.3d 351, 358 (4th Cir. 2011). "Only those employers who 'either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the [FLSA] have willfully violated the statute." *Id.* at 358 (quoting *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133, 108 S. Ct. 1677, 100 L. Ed. 2d 115 (1988)). Thus, "[n]egligence is insufficient to show willfulness." *Id.*

In the instant case, assuming *arguendo* that Plaintiffs were misclassified as exempt employees, ECT certainly has not willfully violated the FLSA. As previously stated, Plaintiffs' training, knowledge,

experience, and primary duties establish that ETC acted in good faith and had a reasonable basis to classify its Support Engineers as exempt employees. Furthermore, ETC has never been involved in a FLSA dispute and no employee has ever suggested that he or she was misclassified as an exempt employee.  Exhibit 1 at ¶ 4.  Thus, the applicable statute of limitations is two years.

### IV.   <u>Conclusion</u>

**WHEREFORE**, Defendant respectfully requests that this Honorable Court deny Plaintiffs' Motion for Summary Judgment, grant Defendant's Cross-Motion for Summary Judgment, and grant such other and further relief as appropriate.

Respectfully submitted,

_____/s/_____
Jody Maier
Federal Bar No. 6051
Levin & Gann, P.A.
502 Washington Avenue, 8th Floor
Towson, Maryland  21204
Phone: (410) 321-0600
jmaier@levingann.com

_____/s/_____
Aaron J. Turner, Esquire
Federal Bar No: 29822
Levin & Gann, P.A.
502 Washington Ave., 8th Floor
Towson, Maryland 21204
Phone:  (410) 321-0600
aturner@levingann.com
Attorneys for Defendant